UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID ANTHONY ESPARZA,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>M. KNOWLES,<br><br>　　　　　Respondent. | 1:04-CV-06172 LJO DLB HC<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, following his conviction by jury trial of making a terrorist threat and brandishing a firearm (Cal. Penal Code §§ 422, 417(a)(2)), assault with a firearm (Cal. Penal Code § 245(a)(2)), attempted murder (Cal. Penal Code §§ 664, 187), and being a felon in possession of a firearm (Cal. Penal Code § 12021(a)). See Lodged Doc. No. 1. In addition, allegations that Petitioner inflicted great bodily injury and personally used a firearm were found to be true. Id. On January 7, 2002, Petitioner was sentenced to serve terms of

thirty-two months, life with the possibility of parole, twenty-five years to life, plus an additional three years. Id.

Petitioner filed a notice of appeal to the California Court of Appeals, Fifth Appellate District (hereinafter "5th DCA"). On June 18, 2003, the 5th DCA struck the three year sentence enhancement and ordered the matter remanded for resentencing on the attempted murder count. Id. The judgment was affirmed in all other respects. Id.

On July 23, 2003, Petitioner filed a petition for review in the California Supreme Court. See Lodged Doc. No. 2. The petition was summarily denied on August 27, 2003. Id.

On August 20, 2004, Petitioner filed a petition for writ of habeas corpus in the Kern County Superior Court. See Lodged Doc. No. 3. The petition was denied on October 18, 2004. Id.

Petitioner then filed a petition for writ of habeas corpus in the 5th DCA on November 19, 2004. See Lodged Doc. No. 4. The 5th DCA denied the petition on September 16, 2005. See Lodged Doc. No. 5.

On December 16, 2005, Petitioner filed a second petition for writ of habeas corpus in the 5th DCA. That petition was denied on January 13, 2006. See Lodged Doc. No. 7.

Petitioner next filed a petition for writ of habeas corpus in the California Supreme Court on February 16, 2006. See Lodged Doc. No. 8. The petition was denied on October 25, 2006. See Lodged Doc. No. 9.

On August 26, 2004, this Court received the instant petition which Petitioner had filed in the Sacramento Division of the United States District Court for the Eastern District of California following an order of transfer to this division. Following a two-year stay of the petition, on January 3, 2007, Petitioner filed an amended petition including newly exhausted claims. The amended petition presents the following seven (7) grounds for relief: (1) "Petitioner was denied the constitutional right to present a defense where court excluded defense evidence of witness bias and fabrication"; (2) "Petitioner's constitutional right to due process was denied where his sentence was enhanced for G.B.I. based upon insufficient evidence"; (3) "Petitioner was denied the constitutional right to effective assistance of trial counsel, where counsel's failure to timely disclose alibi witnesses' statements resulted in sanctions by the court"; (4) "Petitioner was denied the

constitutional right to effective assistance of trial counsel where counsel failed to properly investigate alibi defense"; (5) "Petitioner was denied the constitutional right to effective assistance of trial counsel where counsel failed to move to supress [sic] the only evidence which linked Petitioner to the charged offense"; (6) "Petitioner's constitutional right to a fair trial was denied when the trial court abused its discretion in denying Petitioner's motion to sever the charged offenses"; and (7) "Petitioner's constitutional right to a fair trial and due process was denied when the trial court refused to instruct the jury as to self-defense pursuant to California Jury Instr. 5.17."

Respondent filed an answer to the amended petition on April 17, 2007. Respondent concedes the petition is exhausted. Petitioner did not file a traverse.

**FACTUAL BACKGROUND**

The Court hereby adopts the factual summary of the case as set forth by the 5th DCA in its opinion of June 18, 2003:

1.  *Threatening and Brandishing*

    While Thomas Roman was walking home on February 3, 2001, at approximately 1:30 p.m., a dark blue Suburban pulled up along side him. Roman knew the driver, "David," as the brother of a girl Roman's brother Jose was dating. David was alone in the vehicle. He called Roman's name, pointed a black nine-millimeter handgun at Roman's forehead, and said he was going to kill Roman and Roman's brother Anthony because they had hit his sister and called her names.

    Roman stood paralyzed with fear. He had no prior problems with David and, in fact, he had seen him only once before. Nor was Roman aware of any conflict between his brother and David or, for that matter, between his brother and David's sister. Roman had not hit David's sister. Roman's assailant smiled and drove off.

    Roman reported the incident with David to the police. The detective assigned to the case, Joe Giuffre, played "phone tag" with Roman for several months. On May 2, 2001, Roman quickly identified appellant as his assailant from a photographic line up. At trial, Roman testified that he was "very certain" appellant was the man who had threatened and assaulted him.

    Maria Chappa, appellant's sister, testified she had an ongoing relationship with Jose Roman, Thomas Roman's brother. They have a child together. Their relationship caused inter-family discord, as the Romans did not like her. Thomas Roman, in particular, remained a constant annoyance and spread lies about her. However, no one in the family had ever struck her.

2.  *Attempted Murder and Assault*

    On March 12, 2001, John Perkins, his girlfriend Diana Pimental, and his friend Chad Jackson, went to a house on Garber Way to collect a debt from a man named Leonel. Pimental's mother had rented Leonel a room and he owed her approximately $80 for an

unpaid phone bill. Pimental and her mother made an unsuccessful attempt to collect the money two weeks prior. That Friday, Leonel told them he would have the money on Monday, the 12th.

Pimental and Perkins approached the front door and asked for Leonel. Jackson stayed in the car. When Leonel came out he said he did not have the money, but offered them two parrots instead. When Pimental stated she did not want the parrots, Leonel became angry and said he would not pay Pimental's mother. Perkins, in turn, became angry because Leonel was belligerent, and an argument ensued. Pimental translated the exchange between the two men as Perkins did not speak Spanish.

According to Pimental, Leonel threatened to kill, or have someone kill, Perkins. Leonel was laughing as he said it, so Pimental did not take it seriously at the time. Perkins challenged Leonel to "come out and do it," but Pimental persuaded Perkins to leave with her so there would not be a fight. Pimental gave Perkins a ride home and did not see him again that evening.

Still angry at Leonel's behavior, Perkins decided to collect some friends and go back to the residence that evening. Approximately 10 friends gathered at a park two houses away, while Perkins, his 15-year-old brother Gary, and Chad Ybarra walked up to the house. A little girl in the yard pointed at him, said "that's him, the one in the white shirt," then a man came out of the house, ran towards the fence, and started shooting. Perkins, who was still in the street, turned and ran for his life. Gary testified that no words or gestures were exchanged prior to the shooting. Perkins denied that anyone with him had a weapon.

Five or six shots were fired. Perkins was hit in the back of his head, but kept running. Although bleeding and in pain, he made it to the house of a friend some three blocks away. An ambulance was called and Perkins was taken to the hospital. Perkins was lucky; the bullet entered his scalp, slid across the skull without penetrating it, then exited.

Perkins did not recall speaking to law enforcement prior to being taken to the hospital. Deputy Larry McCurtain testified Perkins told him at the scene that he (Perkins) had been walking down the street when he was fired upon by an unknown Mexican male for no apparent reason. When other witnesses related a different version of events, McCurtain reinterviewed Perkins at the hospital. Perkins then disclosed the earlier collection attempt and confrontation. McCurtain had difficulty obtaining details from Perkins, but he was unable to say whether Perkins was deliberately being evasive.

Officers responding to the Garber Way residence seized an informal photograph of appellant posed with several other people, and mail addressed to appellant at that address. Approximately an hour and a half after the shooting, Perkins identified appellant as his assailant from the photograph. Within another hour Perkins was presented with a formal photographic line up and again easily identified appellant as the man who shot him. Gary Perkins could not identify anyone from the photograph or line up.

At trial, Perkins testified that he was certain appellant was the man who shot him. He was only 10 feet away and was looking directly at the gunman when he opened fire. Perkins used to live next door to Leonel; Leonel, who is much taller and thinner than appellant, was not his attacker. No gun or shell casings were ever recovered.

Appellant presented an alibi defense but did not testify on his own behalf. Lisa Rodriguez, a friend of appellants, testified she, her boyfriend Alex Luna, Victor Navarette, and appellant were all in Los Angeles on the day of the shooting, as Luna was scheduled for trial on narcotics charges in Fullerton that day. Navarette was subpoenaed as a witness and appellant accompanied them because he was familiar with the area and they were not. They

left Bakersfield at 6:00 or 6:30 a.m. The court date was continued after the lunch break. They left the courthouse between 2:00 and 3:00 o'clock, shopped, and visited with appellant's aunt before leaving southern California.

The party returned to Bakersfield between 7:00 and 8:00 p.m. On their arrival they were greeted by appellant's mother (who had been babysitting Rodriguez' children) who was "frantic" over rumors that appellant was in some sort of trouble. Rodriguez learned about the shooting from the newspaper, but never contacted law enforcement regarding appellant's alibi because she did not want to get involved. She had heard the incident was gang related and feared for her safety and that of her five children.

Victor Navarette confirmed Rodriguez's testimony in all significant respects. However, he was impeached with the fact that he initially told the investigator that the court appearance was for Alex Garza, and that a fifth person had been in the car.

See Lodged Doc. No. 1 at pp. 2-6.

## DISCUSSION

### I.  Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

### II.  Legal Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A

federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

**III.  Review of Petitioner's Claims**

   **A. Ground One**

In his first ground for relief, Petitioner claims the trial court abused its discretion in denying Petitioner's right to present defense evidence of witness bias and fabrication. Petitioner sought to introduce evidence that Thomas Roman had allegedly made false complaints and police reports against Petitioner and members of his family. Petitioner presumably sought to impeach Roman's credibility with this evidence.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. am. VI. The Sixth Amendment's Confrontation Clause was made applicable to the states through the Due Process Clause of the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403-05 (1965). The Confrontation Clause gives a defendant the right "to be confronted with the witnesses against him." Id. "[T]he Confrontation Clause guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" Kentucky v. Stincer, 482 U.S. 730, 739 (1987), *quoting* Delaware v. Fensterer, 474 U.S. 15, 20 (1985).  The Confrontation Clause is generally satisfied when the

1  defense is given a full and fair opportunity to probe and expose [the witness'] infirmities through

2  cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant

3  weight to the witness' testimony. <u>Fensterer</u>, 474 U.S. at 21-22.

4        This claim was first presented on direct appeal to the 5th DCA.  On June 18, 2003, the 5th

5  DCA denied the claim in a reasoned opinion.  <u>See</u> Lodged Doc. No. 1.  The claim was then presented

6  to the California Supreme Court where it was summarily denied on August 27, 2003. <u>See</u> Lodged

7  Doc. No. 2. The California Supreme Court, by its "silent order" denying review of the 5th DCA's

8  decision, is presumed to have denied the claims presented for the same reasons stated in the opinion

9  of the 5th DCA.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).

10        The 5th DCA first summarized the relevant facts, as follows:

> On cross-examination, appellant's counsel asked Roman whether he had any problems with appellant's family. He denied any disagreement in the family due to Jose Roman's and Maria Esparza's relationship. He admitted that appellant's mother had come at him with a knife and that he had reported the incident to the police, but maintained it had nothing to do with Jose and Maria. When appellant's trial counsel asked if Roman knew Rudy Reyes, appellant's cousin, the prosecutor objected on grounds of relevancy and discovery. Appellant's counsel defended the relevance of the question at a sidebar conference:
>
> "MR. KATHKA [DEFENCE COUNSEL]: ... Rudy Reyes, Junior and Senior, they are cousins of my client. They live just across the street on Garber Way as well. They indicate they started having trouble with Thomas Roman last winter, December of 2000, January of 2001, over an incident involving paint ball guns, him and his brother shooting paint ball guns all over [the] neighborhood. They reported these incidents. They then started having all sorts of problems with the Roman family, specifically Thomas Roman. Thomas Roman had called the 14 year old, asked her how much she charged and basically called her a prostitute, in so many words, in March of last year. He got in a fight with Marcus Banducci, that's the other witness we subpoenaed, that -in July of last year basically because- Mr. Banducci told me this morning basically because he was a friend of Thomas. I mean of -
>
> "THE COURT: The Esparzas?
>
> "MR. KATHKA: No. Of Mr. Reyes. And Mr. Reyes is related to the Esparzas. And basically this person, his brother, knocked Mr. Banducci unconscious. When the Reyes tried to come to his rescue, after he was knocked unconscious. Basically the police came out and investigated it, they arrested these two gentlemen for assault. They reported falsely, evidently, for all the other witnesses, that Mr. Reyes had assaulted Thomas with a pole, basically making a false report. But there's a real history between this gentleman and my client's family. And specifically that they all live in the same neighborhood. I think it's to bias and motive. It also might be admissible character evidence for the authority under that, your Honor.
>
> "THE COURT: Is your defense self-defense?
>
> "MR. KATHKA: No. But there is an allegation -- and there's allegations that these

people make false reports, that they call the police all the time, there is a real grudge, which he is denying, amongst the families. There's a disagreement -- I believe the sister may be testifying as well, I will learn that today, that these two are very antagonistic towards her and the relationship between her and Jose and just generally antagonistic toward my client and his family in general. And this antagonism has developed to the point of making false reports to the police to getting in fights."

The prosecutor countered that the evidence was relevant only to tangential issues. The court agreed, and sustained the objection.

"THE COURT: I'm having trouble dealing with the relevance issue. I mean, you have -- I have allowed you, as you know, to examine. Didn't you have a beef with his mother as -- the defendant's mother? Haven't you had other beefs with the family? Isn't your family pretty unhappy about Mr. Esparza's sister having a relationship with Jose? I have allowed you to ask that. But, there is very little, if any, relevance to bringing in people or to question this man about incidents he's had with other extended family relatives of the defendant on the theory, which is the only theory that I could -- that you have hit upon, the only possible theory you could urge it on, on the theory that then those people are going to come in and say that he made false reports about us. And you have got involved people, you are going to end up trying a whole bunch of little sub cases in this case. And unless you can show a better basis for doing this than what you propose, I will sustain the objections before me now. That has nothing to do with discovery. It has to do with relevance."

See Lodged Doc. No. 1 at pp. 6-8.

The 5th DCA then analyzed the claim and rejected it as follows:

Appellant argues that all relevant evidence is admissible and the proffered evidence was relevant as it tended to establish whether Roman was truthful in his testimony. The evidence was nonetheless properly excluded.

"Although the right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility, 'trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination.' [*Citation.*]" (People v. Quartermain (1997) 16 Cal.4th 600, 623, quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679.)

Appellant's protestations to the contrary, evidence of Roman's conflicts with Banducci and the Reyes', was not directly relevant to the issue at trial: whether appellant drew a gun on, and threatened, Roman on February 3, 2001. None of appellant's proposed witnesses was prepared to testify the confrontation did not happen, or could not have happened, i.e., that Roman or appellant was somewhere else at the time in question. The proposed testimony bore only on Roman's credibility.

Appellant claims the prosecution's ability to present evidence of a defendant's prior sex offenses and domestic violence (*People v. Falsetta* (1999) 21 Cal.4th 903) grants him a reciprocal due process right to present evidence of a witness's prior falsehood to establish a propensity to lie. This novel argument is completely unfounded. As our Supreme Court observed in *People v. Falsetta*, "'The rule excluding evidence of criminal propensity is nearly three centuries old in the common law.'" (*Id*. at p. 913.) In California, this rule is codified in Evidence Code section 1101, subdivision (a). Evidence code sections 1108 and 1109 provide specific exemptions for evidence of prior acts of domestic violence and sexual assault from section 1101. The Legislature has enacted no comparable section for truthfulness. Sections 1108 and 1109 do not abrogate the general rule excluding evidence of prior acts to prove

propensity as expressed in section 1101. Both sections 1108 and 1109 have withstood constitutional scrutiny. (See *People v. Falsetta, supra*, 21 Cal.4th at pp. 916-922; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1095-1096; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1309-1313; *People v. Johnson* (2000) 77 Cal.App.4th 410, 417-420; *People v. Brown* (2000) 77 Cal.App.4th 1324, 1331-1334; *People v. Hoover* (2000) 77 Cal.App.4th 1020,1025-1029.) If due process is not offended by admission of evidence of prior sexual assault and/or domestic violence to prove a propensity to commit charged sex crimes and/or domestic violence under sections 1108 and 1109, it cannot be said that due process is violated in cases not alleging sexual crimes or domestic abuse where such evidence is not introduced.

A defendant's right to confront witnesses by impeachment on cross-examination is not violated if a reasonable jury would not have received a significantly different impression of the witness's credibility had the defendant been permitted to pursue the proposed line of cross-examination. (*Delaware v. Van Arsdall, supra*, 475 U.S. at p. 680.) Roman's biases, and hence his motivation to fabricate, were presented to the jury. Appellant was able to establish the existence of an interfamily conflict through Maria's testimony and Roman's incident with appellant's mother. Roman also testified that after the shooting he saw appellant and some friends jump the fence at his parents' house with the purpose of attacking Roman's father.

Roman's interactions with appellant's cousins is significantly less probative of the truthfulness of his trial testimony. Although they lived somewhere on the same street, the Reyes' were not appellant's immediate family members, and counsel never articulated a basis for inferring animus against them to appellant. Indeed, Roman and the Reyes' apparently had a long running grudge arising out of behavior that had nothing to do with appellant or his sister.

As pointed out by the trial court, establishing Roman's alleged untruthfulness on this issue would have consumed an unwarranted amount of time. The Reyes' and Banducci would have to explain their relationship to appellant and their versions of their dealings with Roman. The prosecutor would be entitled to cross-examine them on their biases against Roman. Roman, and likely his brother(s), would be called to rebut the allegations. Finally, various law enforcement officers would likely be called to establish whether a police report was taken, what, if any, action was taken on the report, and whether the police considered the report unfounded. This testimony could easily have consumed as much time, if not more, as the case in chief.

In the instant case, the trial court weighed the minimal probative value of the proposed testimony against its concern with avoiding undue consumption of time that would be caused by trying "a whole bunch of little sub cases" on the issue of Roman's credibility. This legitimate concern justified the exclusion of the proffered impeachment evidence. (*People v. Alcala* (1992) 4 Cal.4th 742, 788.) Without specifically designating Evidence code section 352, it is apparent that is what motivated the trial court. Evidence code section 352 provides:

> "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Appellant's contention that the evidence should have been admitted because it was not prejudicial, i.e., not inflammatory or bias inducing, misses the mark. The evidence was not excluded due to its prejudice, it was excluded as collateral and unduly time consuming. As the California Supreme Court recently noted:

> "A trial court's discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of discretion. [Citation.] '"[T]he latitude section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." [Citation.]' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 374-375.)
>
> There was no error by the trial court.

See Lodged Doc. No. 1 at pp. 8-10.

The appellate court's determination is not unreasonable. As discussed by the appellate court, the witness' possible bias and prejudice against Petitioner was made known to the jury by the questioning allowed by the court of the witness and by the testimony of Maria. Petitioner was able to establish the existence of an interfamily conflict and therefore a motivation for the witness to fabricate. There was nothing to be gained by allowing further questioning of the witness on these issues. However, doing so would have consumed a vast amount of time. Thus, the trial court did not err by finding the evidence to be collateral and unduly time consuming, and Petitioner was not denied his constitutional rights under the Confrontation Clause.

Accordingly, the rejection of this claim by the state courts was neither contrary to or an unreasonable application of clearly established Federal law, nor an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d). The claim should be denied.

**B. Ground Two**

In his next claim, Petitioner asserts that there was insufficient evidence to support the jury's finding of great bodily injury as to Petitioner's shooting of the victim, Perkins, in the head.

In reviewing sufficiency of evidence claims, California courts expressly follow the Jackson standard enunciated in Jackson v. Virginia, 443 U.S. 307 (1979). See People v. Johnson, 26 Cal.3d 557, 575-578 (1980); see also People v. Thomas, 2 Cal.4th 489, 513 (1992). Pursuant to the Supreme Court's holding in Jackson, the test in determining whether a factual finding is fairly supported by the record is as follows:

> "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).

1    Sufficiency claims are judged by the elements defined by state law. Jackson, 443 U.S. at 324

2  n. 16. This Court must presume the correctness of the state court's factual findings. 28 U.S.C.

3  § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986). This presumption of correctness

4  applies to state appellate determinations of fact as well as those of the state trial courts. Tinsley v.

5  Borg, 895 F.2d 520, 525 (9th Cir.1990). Although the presumption of correctness does not apply to

6  state court determinations of legal questions or mixed questions of law and fact, the facts as found by

7  the state court underlying those determinations are entitled to the presumption. Sumner v. Mata, 455

8  U.S. 539, 597 (1981).

9    This claim was also first presented on direct appeal to the 5th DCA and rejected in a reasoned

10 opinion. See Lodged Doc. No. 1. Also, the claim was presented to the California Supreme Court in

11 the petition for review and it was summarily denied on August 27, 2003. See Lodged Doc. No. 2.

12   The 5th DCA analyzed the claim as follows:

> "It is well settled that the determination of great bodily injury is essentially a question of fact, not of law. "'Whether the harm resulting to the victim ... constitutes great bodily injury is a question of fact for the jury. [Citation.] If there is sufficient evidence to sustain the jury's finding of great bodily injury, we are bound to accept it, even though the circumstances might reasonably be reconciled with a contrary finding.'" [Citations.]" *(People v. Escobar* (1992) 3 Cal.4th 740, 750 omitted.)
>
> "Great bodily injury is bodily injury which is significant or substantial, not insignificant, trivial, or moderate." *(People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066; see CALJIC 9.02.) While the law formerly required permanent or extended disfigurement, impairment, or loss of bodily function, these strictures have been abandoned. (See *People v. Caudillo* (1978) 21 Cal.3d 562, 588-589 [applying the former test], disapproved in *People v. Escobar, supra*, 3 Cal.4th at pp. 745-750.) In *Escobar* a rape victim's bloody knees, abrasions, painful neck, and vaginal soreness was held to constitute great bodily injury.
>
> Perkins's scalp was pierced by a bullet which traveled approximately two and one half inches before exiting his head. Perkins testified he was bleeding "quite a bit" and in "a lot" of pain after being shot. Perkins described having a "big mushy knot like a softball a lot of blood" on the "whole back" of his head. He was initially given morphine for pain, and the hematoma was drained so that the swelling would not effect the brain. Perkins was discharged the next day. At the time of trial, (10 months later), Perkins reported the wound caused painful headaches if he slept on it.
>
> Numerous pre-*Escobar* decisions, which applied the more stringent standard adopted in *People v. Caudillo, supra*, 21 Cal.3d 562, have upheld findings of great bodily injury based on injuries of comparable or less severity. (See, e.g., *People v. Jaramillo* (1979) 98 Cal.App.3d 830 [battered child suffered multiple contusions and swelling of her hands, arms and buttocks]; *People v. Sanchez* (1982) 131 Cal.App.3d 718 [multiple abrasions and lacerations to the victim's back and bruising of the eye and cheek]; *People v. Brown* (1985) 174 Cal.App.3d 762 [one-inch long laceration of victim's vagina]; *People v. Corona* (1989) 213 Cal.App.3d 589 [swollen jaw, bruises to head and neck and sore ribs].)

> Perkins's injury was at least as significant and substantial as the injuries suffered by the victims in *People v. Mendias* (1993) 17 Cal.App.4th 195, *People v. Wolcott* (1983) 34 Cal.3d 92 and *People v. Lopez* (1986) 176 Cal.App.3d 460, where great bodily injury findings were upheld. In *Mendias*, the victim was shot in the upper thigh and experienced burning pain. He was admitted to the hospital, treated and released the next day. The bullet was not removed. At trial, the victim testified that the bullet moved but was not painful. (*People v. Mendias, supra*, at p. 201.) In *Lopez*, the defendant argued that one victim "felt no pain when he was shot in the right cheek of the hip and that there was no evidence that the wound was more than superficial. Appellant note[d] that a bullet traversed [the other victim's] thigh, but there was no evidence that the wound was more than superficial or that she suffered more than momentary distress." (*People v. Lopez, supra*, 176 Cal.App.3d at p. 463, fn. omitted.) There was "no evidence that either [victim] sought or received medical treatment ...." (*Id*. at p. 463, fn. 5.) In *Wolcott*, the victim was shot in the calf, the bullet fragmenting. The treating doctor removed one fragment but left the others to "work their way out naturally." (*People v. Wolcott, supra*, 34 Cal.3d at p. 107.) The victim lost little blood, no sutures were required, and the victim was released after treatment and went to work the next day. The victim suffered "no permanent disability, but feels pain when his arm is touched near the unremoved bullet fragments." (*Ibid*.)
>
> Appellant claims *Lopez* was wrongly decided, faulting its lack of analysis. We have located no opinion of any court, published or unpublished, which shares appellant's opinion. The *Lopez* decision quotes *Wolcott* at length, including *Wolcott's* discussion of *People v. Jaramillo, supra*, 98 Cal.App.3d 830, *People v. Sanchez, supra*, 131 Cal.App.3d 718, *People v. Williams* (1981) 115 Cal.App.3d 446, and *People v. Salas* (1978) 77 Cal.App.3d 600. We find the *Lopez* and *Wolcott* decisions well reasoned.
>
> Appellant nonetheless argues *Lopez* and *Wolcott* are distinguishable. Unlike the victims in *Lopez,* Perkins did not fall to the ground, scream, become disoriented, or feel "fire." Rather, Perkins ran three blocks and was offered only over the counter medications on discharge. Furthermore, Perkins's wound was smaller than that in *Wolcott,* no invasive procedures were performed, and no foreign bodies remained. We conclude the seriousness of a wound is not dependant on the stamina, constitution, or stoicism of the victim. Perkins suffered a piercing gunshot wound to the back of his head. We reject appellant's supposition that no underlying tissue was damaged. The wound bled. Perkins felt significant pain. He developed a swollen area the size of a baseball. He sought medical treatment and was kept for observation. It is perfectly foreseeable that a similarly situated victim would have reacted dramatically. Perkins's physical ability and tolerance for pain do not diminish the seriousness of his injury. The wound was not superficial. (See *People v. Jung* (1999) 71 Cal.App.4th 1036, 1042 ["Abrasions, lacerations, and bruising can constitute great bodily injury"].)

See Lodged Doc. No. 1 at pp. 11-13.

In light of the above, it cannot be said that the state court resolution of this claim was unreasonable. The Court must presume the correctness of the state court finding that the gunshot wound to the victim's head was great bodily injury. Petitioner fails to overcome the presumption. The claim should be denied.

### C. Grounds Three, Four and Five

In his next three grounds for relief, Petitioner claims he was denied the effective assistance of trial counsel. In claim three, Petitioner claims trial counsel failed to timely disclose alibi witness

1  statements thereby resulting in sanctions by the court. In claim four, Petitioner asserts trial counsel
2  failed to properly investigate his alibi defense. In claim five, Petitioner argues trial counsel failed to
3  move to suppress evidence which linked Petitioner to the charged offense.

4        The law governing ineffective assistance of counsel claims is clearly established for the
5  purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151
6  F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance
7  of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S. 668, 687, 104
8  S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must
9  show that counsel's performance was deficient, requiring a showing that counsel made errors so
10 serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.
11 Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an
12 objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were
13 not the result of reasonable professional judgment considering the circumstances. Id. at 688; United
14 States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's
15 performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls
16 within the wide range of reasonable professional assistance.  Strickland, 466 U.S. 668, 687, 104
17 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

18       Second, the petitioner must demonstrate that "there is a reasonable probability that, but for
19 counsel's unprofessional errors, the result ... would have been different," 466 U.S., at 694. Petitioner
20 must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose
21 result is reliable.  Strickland, 466 U.S. at 688.  The court must evaluate whether the entire trial was
22 fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78
23 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

24       A court need not determine whether counsel's performance was deficient before examining
25 the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S.
26 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since the defendant must affirmatively prove prejudice, any
27 deficiency that does not result in prejudice must necessarily fail. However, there are certain instances
28 which are legally presumed to result in prejudice, e.g., where there has been an actual or constructive

denial of the assistance of counsel or where the State has interfered with counsel's assistance. See Strickland, 466 U.S. at 692; United States v. Cronic, 466 U.S., at 659, and n. 25, 104 S.Ct., at 2046-2047, and n. 25 (1984). Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000). Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

These claims were first presented on collateral review to the Kern County Superior Court. See Lodged Doc. No. 3. On October 18, 2004, the Kern County Superior Court denied the claims in a reasoned opinion. Id. The claims were then presented to the 5th DCA where they were denied on the merits on September 16, 2005. See Lodged Doc. Nos. 4, 5. Petitioner then presented his claims to the California Supreme Court, where they were summarily denied on October 25, 2006. See Lodged Docs. Nos. 8, 9. The California Supreme Court, by its "silent order" denying review of the 5th DCA's decision, is presumed to have denied the claims presented for the same reasons stated in the opinion of the 5th DCA. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

*1. Failure to Timely Disclose Alibi Witnesses*

Just prior to the commencement of trial, the prosecution moved to exclude the testimony of two alibi witnesses: Lisa Rodriguez and Victor Navarette. RT[1] 18-20. The prosecutor stated he had not been timely given copies of the statements of these alibi witnesses by the defense counsel despite the fact defense counsel had copies of the reports available 2 weeks prior. RT 18-20. The prosecutor argued he did not have adequate time to prepare for these witnesses. RT 18-23. As a result, the trial court did not suppress the evidence; however, the court sanctioned the defense by giving an instruction to the jury on the untimely production of evidence. Pursuant to CALJIC No. 2.28, the trial court instructed the jury as follows:

> Disclosures of evidence are required to be made at least 30 days in advance of trial. Any new evidence discovered within 30 days of trial must be disclosed immediately. In this case, defendant failed to timely disclose the following evidence: The names and statements of Lisa Rodriguez and Victor Navarette.
>
> The court has, nevertheless, under the law, permitted the production of the evidence at trial.

---

[1]"RT" refers to the Reporter's Transcript on Appeal lodged by Respondent.

> The weight and significance of any delayed disclosure are matters for your consideration. However, you should consider whether the untimely disclosed evidence pertains to a fact of importance, something trivial or subject matters already established by other credible evidence.

RT 272-273.

In rejecting this claim, the superior court applied the proper standard and found Petitioner suffered no prejudice. The court noted the instruction given did not bolster the prosecution's argument regarding the alibi defense, nor did it deny Petitioner a meritorious defense. Further, the evidence was in fact admitted. Last, Petitioner failed to present any facts or evidence that the jury gave any weight to the delay in disclosure.

The state court's rejection of Petitioner's claim for lack of prejudice is reasonable. The witnesses were able to testify that they were with Petitioner more than one hundred miles away from the scene of the shooting at the time it occurred. The evidence was submitted to the jury for consideration. It is not reasonable to conclude that the jury believed the witnesses' accounts but then chose to discredit their testimony because the prosecutor was not given ample time to investigate. Accordingly, the state court rejection of this claim was a consistent and reasonable application of governing Supreme Court authority.

### *2. Failure to Properly Investigate Alibi Defense*

Petitioner's defense at trial was that he was attending court in the City of Fullerton at the time of the incident and was then later visiting with his aunt at her residence. Petitioner faults trial counsel for failure to secure court documents which purportedly would have showed a court appearance for Petitioner's acquaintance, or testimony from his aunt that Petitioner was in fact at her residence at the time of the incident. Petitioner further faults trial counsel for failing to secure the attendance of counsel's investigator who could have testified to additional information regarding the alibi defense.

The state court properly rejected this claim as speculative. Petitioner provides no facts whatsoever regarding the court matter he allegedly attended. He fails to state whether he was a party or witness in the matter, whether he had been subpoenaed to attend, what the case number was, whether he was there to attend a hearing or some other matter, what courtroom he was in, or whether he was represented by counsel. In addition, he provides no particulars on what could have been

1  elicited from the investigator.

2  Furthermore, Petitioner fails to show how the evidence could have altered the outcome.
3  Witnesses Rodriguez and Navarette did in fact testify that Petitioner was with them at court in
4  Fullerton at the time of the shooting. As correctly argued by Respondent, the additional evidence
5  would have added nothing meaningful to the defense. Accordingly, this claim was reasonably
6  rejected by the state court.

7  *3. Failure to Move to Suppress*

8  Next, Petitioner complains trial counsel failed to move to suppress a photograph allegedly
9  secured improperly by law enforcement from the house of one Debbie Solano. From this photograph,
10 the victim made his first of three identifications of Petitioner as the perpetrator.

11 The state court also correctly rejected this claim. First, there was no error on the part of
12 defense counsel, because counsel cannot be faulted for failing to raise a meritless objection.
13 Petitioner submits a statement from Debbie Solano dating to three years after the incident wherein
14 she stated she had not given law enforcement permission to enter her residence. However, Petitioner
15 concedes the police officer stated in her report that Solano did in fact give her permission to enter
16 and search. Without more, it is clear the trial court would have resolved the issue in the prosecution's
17 favor.

18 Moreover, there is no prejudice. Although the victim made his first identification from this
19 photograph, he later positively identified Petitioner from a separate photographic lineup and again at
20 trial as the perpetrator. This claim was also rightly rejected.

21 **D. Ground Six**

22 Petitioner next argues the trial court abused its discretion in failing to sever the charged
23 offenses. Petitioner argues that the two separate offenses occurred at different dates and had no
24 transactional or logical relationship to merit joinder. Petitioner claims he was prejudiced because the
25 jury likely convicted him on the terrorist threat offense based on the alleged facts in the attempted
26 murder charge.

27 As correctly set forth by Respondent, the Supreme Court has stated that improper joinder, in
28 itself, does not violate the Constitution. United States v. Lane, 474 U.S. 438, 446 n.8 (1986).

"Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." Id.

Here, Petitioner was not so prejudiced as to be denied a fair trial. As noted by Respondent, the terrorist threat charge was not weak. It was supported by eyewitness testimony by the victim who had come face to face with Petitioner at which time Petitioner pointed a gun at him and threatened to kill him. The victim made three positive identifications of Petitioner as the perpetrator including an in-court identification, and he stated he was certain of his identification. In addition, both the prosecutor and defense counsel stressed that Petitioner was charged with separate offenses and the facts of one could not be applied to the other. Further, Petitioner points to no evidence that the jury convicted him on one count based on facts from the other counts. Accordingly, the rejection of this claim was not unreasonable.

**E. Ground Seven**

In his final claim for relief, Petitioner alleges the trial court erred in refusing to instruct the jury as to self-defense pursuant to CALJIC No. 5.17.

As a preliminary matter, the court notes that an allegation involving the omission of a jury instruction under state law does not form a basis for federal habeas corpus relief. Estelle v. McGuire, 502 U.S. 62, 67, 112 S.Ct. 475 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law."). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the instructions given the jury so infected the entire trial that the resulting conviction violates due process. Id. at 72, *citing* Cupp v. Naughten, 414 U.S. 141, 147 (1973). The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. See United States v. Frady, 456 U.S. 152, 169 (1982), *citing* Henderson v. Kibbe, 431 U.S. 145, 154 (1977). Furthermore, even if it is determined that the instructions violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instructions had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993) (whether the error had a substantial and injurious effect or influence in determining the jury's verdict.). See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996). "The burden of demonstrating that an

erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson, 431 U.S. at 154. "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Id.

In this case, the trial court rejected the proposed instruction, reasoning as follows:

> And my reasoning is - - I don't disagree with anything you said, including the fact that the court must instruct on any theory that might present itself in the case, whether it will be argued or heard by the defense or not. In this case, however, my reasoning in rejecting the 5.17, although it is not going to impact the range of verdicts made available to the jury, I'm not going to instruct on the actual but unreasonable belief with regard to the defense because (a), we have no testimony as to the state of mind of the defendant; (b), we do not - - there were ten people in the park apparently ready to come in as a flying squad, if things soured with the first three guys that went up to the place, but there is no evidence at all on the record that anybody knew they were down there, so they aren't really an issue; (c), the object of the assault, if there was going to be an assault by Mr. Perkins and his friends, was not the defendant; and (d), there is no indication that the precise moment that the shots were fired, if they were fired by the defendant - - and that's obviously the issue that the jury is going to have to come to grips with, an issue, rather - - there is no indication that anybody at that point in time, based on the testimony that we have, was doing anything that could possibly cause a person to believe it was time to open fire. So I'm rejecting that.

RT 209-210.

Respondent persuasively argues that this claim is not cognizable in a federal habeas action because Petitioner is simply arguing the application of state law. Moreover, the trial court clearly applied the law correctly finding the instruction not warranted in light of the evidence. The omission of the instruction did not deprive Petitioner of a fair trial. Therefore, the state court denial of this claim was not contrary to or an unreasonable application of controlling Supreme Court authority. The claim should be denied.

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days (plus three days if served by mail) after being served with a copy,

1  any party may file written objections with the court and serve a copy on all parties.  Such a document
2  should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to
3  the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail)
4  after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to
5  28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified
6  time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th
7  Cir. 1991).

8      IT IS SO ORDERED.

9      **Dated:**   **August 27, 2007**            **/s/ Dennis L. Beck**
                                                      UNITED STATES MAGISTRATE JUDGE